## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

MICHAEL S. BURKE,                         )
                                          )
      Plaintiff,                       )
                                          )
v.                                        )        Case No. CIV-18-00984-JD
                                          )
CITY OF OKLAHOMA CITY, a                  )
municipal corporation,                    )
JOSHUA NORTON, an individual, and         )
JASON SAMUEL, an individual,              )
                                          )
      Defendants.                      )

## <u>ORDER</u>

Plaintiff Michael S. Burke was arrested for public intoxication at an Oklahoma City Thunder game and was injured while in police custody. He later sued the City of Oklahoma City ("City") and Joshua Norton and Jason Samuel—two of the Oklahoma City police officers involved in his arrest—for civil rights violations and negligence. The Defendants moved for summary judgment at the conclusion of discovery, and those motions are before the Court. For the reasons discussed below, the Court GRANTS the motions to the extent they seek summary judgment on Burke's federal constitutional claims and REMANDS the remaining state-law claims to the District Court of Oklahoma County under 28 U.S.C. § 1367(c).

## I.   PROCEDURAL HISTORY

Burke originally filed this lawsuit against the City and John Does 1–3 in the District Court of Oklahoma County. [Doc. No. 1-1]. Burke's state-court Petition alleged that the City was negligent and that John Does 1–3 had violated Burke's federal

constitutional rights. Because Burke alleged violations of federal law, the City removed the action to this Court under 28 U.S.C. §§ 1331, 1343, and 1441(a). [Doc. No. 1].

After removal, Burke filed an Amended Complaint. [Doc. No. 12]. He later filed a Second Amended Complaint ("SAC") that added a claim against the City for municipal liability on the alleged constitutional violations and identified the John Does as Norton and Samuel. [Doc. No. 27].

Burke's operative complaint, the SAC, alleges that Samuel arrested Burke at an Oklahoma City Thunder basketball game for harassing Samuel's daughter and another young woman. SAC ¶ 5. Samuel allegedly frisked, searched, and handcuffed Burke with the assistance of Norton, and then Norton and an unknown officer took Burke outside the arena to wait for an on-duty officer transport to an alcohol and drug center, commonly known as "Detox." *Id.* ¶¶ 5–6. During this wait, Norton and the other officer allegedly placed Burke against a concrete retaining wall, after which Burke was pushed or allowed to fall to the ground, resulting in injuries to his ribs and various cuts and contusions. *Id.* ¶ 5. Burke alleges that he asked to be taken to a medical facility, but Norton and the other officer refused and instead took him to Detox. *Id.* Burke also alleges that neither Samuel nor Norton filed any report or documentation regarding Burke's arrest or injuries, in accordance with the City's policy of not documenting or reporting the arrest or transport of citizens to Detox. *Id.* ¶¶ 6–7.

Based on these allegations, the SAC asserts that Norton and Samuel violated Burke's civil rights by arresting him without factual or legal cause, using excessive and unnecessary physical force, failing to protect him from unnecessary harm after his arrest,

and failing to provide prompt medical treatment after he was injured, in violation of the Fourth, Eighth,[1] and Fourteenth Amendments to the United States Constitution. SAC ¶¶ 9–10. The SAC also alleges that the City's policy or custom of encouraging officers not to document arrests that result in a subject being taken to Detox violated Burke's civil rights and denied him meaningful access to the courts by shielding the identities of the officers involved. *Id.* ¶¶ 12–13. Finally, the SAC alleges that the Defendants were negligent in failing to protect Burke from injury and that the City was negligent in its hiring, training, and discipline of police officers and in its failure to require the reporting of civil rights violations relating to arrests, detentions, assaults, accidents, injuries, and transports. *Id.* ¶¶ 11, 15–16.

Defendants filed answers to the SAC, denying liability. *See* Norton's Answer to SAC [Doc. No. 34]; Samuel's Answer to SAC [Doc. No. 40]; City's Answer to SAC [Doc. No. 33]. Norton and Samuel admitted that their actions were under color of law, and they asserted qualified immunity as an affirmative defense to claims in their individual capacities. *See* Norton's Answer at 1, ¶ 2 and 5, ¶ 12; Samuel's Answer at 1,

---

[1] Burke later moved to voluntarily dismiss his Eighth Amendment claims against the Defendants [Doc. No. 35], which Judge DeGiusti granted by Order dated June 17, 2019 [Doc. No. 37]. The Order noted that Burke's request appeared responsive to the City's Motion to Dismiss [Doc. No. 32], in which the City argued the Eighth Amendment does not provide the relevant standard for Burke's claims for excessive force or failure to provide prompt medical care. The Order observed that the dismissal did not dismiss any claims, but merely narrowed the legal theories on which Burke sought recovery.

¶ 2 and 5, ¶ 11.[2] At the conclusion of discovery, Defendants moved for summary judgment on all claims.

## II.   THE PARTIES' ARGUMENTS ON SUMMARY JUDGMENT

Norton and Samuel contend they are entitled to qualified immunity on Burke's constitutional claims because (1) there was probable cause to arrest Burke for public intoxication or, alternatively, it would not have been apparent to a reasonable officer that probable cause was lacking, (2) Samuel was not present when Burke was injured or needed medical care, (3) there is no evidence Norton pushed Burke, (4) it would not have been apparent to a reasonable officer in Norton's position that Burke needed medical care or that a failure to provide such care under the circumstances in this case was a clearly established constitutional violation, and (5) any failure to document Burke's arrest and injuries is not a constitutional violation. The City also seeks judgment on Burke's constitutional claims, arguing that there was no constitutional violation and that, even if there were, Burke cannot show a municipal policy caused the violation.

As for Burke's claim of negligence, Norton and Samuel contend they are not proper defendants under Oklahoma's Governmental Tort Claims Act ("GTCA") because they were acting within the scope of their employment. The City, for its part, argues there is no evidence supporting a negligent hiring, training, or supervision claim and that it is immune from liability on Burke's claim that officers were negligent in failing to protect him from harm because the GTCA exempts the State and its political subdivisions from

---

[2] The Court uses ECF page numbering in this Order.

liability for losses or claims resulting from the failure to provide or the method of providing police, law enforcement, or fire protection.

In response, Burke concedes that he lacks evidence to support a claim against Samuel for excessive force or failure to provide medical care. He also purports to dismiss his negligence claims against Norton and Samuel without prejudice. He otherwise opposes Norton's and Samuel's motions. He contends that they could not develop probable cause to believe he was publicly intoxicated because they did not conduct a sobriety test. He also argues that Norton and Samuel are not entitled to summary judgment on Burke's claim of excessive force because (1) Norton and Samuel engaged in an alleged conspiracy of silence that prevented him from identifying the other officer present when he was injured, and (2) gratuitous force against a restrained, unresisting detainee is a clearly established violation of the Fourth Amendment. Finally, Burke argues that a reasonable jury could find that Norton was deliberately indifferent to Burke's serious medical needs, and he argues that deliberate indifference to serious medical needs is a clearly established constitutional violation.

As for the City, Burke argues that the City has a policy of prohibiting officers from documenting arrests and transports of citizens to Detox, and he argues that this policy violated (or contributed to the violation of) Burke's right to access the courts of the United States because it prevented him from identifying and suing all of the officers who caused him harm. He also appears to argue that his excessive force claim against the City is valid, but he offers no analysis of municipal liability. Finally, Burke agrees there is no evidence supporting a claim of negligent hiring, training, or supervision against the

City, but he contends that his failure-to-protect claim does not fall within the GTCA's exemption for losses caused by the failure to provide or the method of providing police, law enforcement, or fire protection.

## III.    STANDARD OF DECISION

### A. Qualified Immunity

Section 1983 provides a federal cause of action against any citizen or other person who, while acting under color of state law, deprives another person of his or her federal rights. 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights, but rather a vehicle "for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (citation omitted). Liability is limited, however, by the doctrine of qualified immunity, which shields government officials from liability for civil damages unless their conduct violates "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weise v. Casper*, 593 F.3d 1163, 1166 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Apodaca v. Raemisch*, 864 F.3d 1071, 1075 (10th Cir. 2017) (explaining that "qualified immunity serves to protect [public employees] . . . from personal liability").

When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff bears an initial burden to show that "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (citation omitted).

"Courts have discretion to decide the order in which to engage the[ ] two [qualified immunity] prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Pearson*, 555 U.S. at 236). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*

### B.  Traditional Burden on Summary Judgment

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if a rational trier of fact could find in favor of the nonmoving party on the evidence presented. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018).

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Where the movant does not bear the burden of persuasion at trial, "[the movant] may satisfy this burden 'by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim.'" *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir.), *cert. denied*, 140 S. Ct. 554 (2019) (quoting *Herrera*, 506 F.3d at 1309); *see also Celotex Corp.*, 477 U.S. at

322–23 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial. In such a

situation, there can be 'no genuine issue as to any material fact,' since a complete failure

of proof concerning an essential element of the nonmoving party's case necessarily

renders all other facts immaterial.").

Once the movant meets its initial burden, "the burden then shifts to the nonmovant

to set forth specific facts from which a rational trier of fact could find for the

nonmovant." *Herrera*, 506 F.3d at 1309 (cleaned up). The nonmovant must identify such

facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated

therein." *Id.*

In applying this standard, the Court "view[s] the evidence and draw[s] all

reasonable inferences therefrom in the light most favorable to the party opposing

summary judgment." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138,

1148 (10th Cir. 2000). However, unsupported statements based merely on conjecture,

speculation, or subjective belief are not competent summary judgment evidence. *See*

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## IV.    STATEMENT OF FACTS[3]

### A. Burke's Arrest

On the evening of April 4, 2017, Burke attended a Thunder basketball game at the Chesapeake arena in Oklahoma City. *See* ¶ 2 of Samuel's Statement of Material Facts ("SMF") in Samuel's Mot. [Doc. No. 80]. At some point, Burke went into the Bank of Oklahoma ("BOK") suite to see if he knew anyone. [*Id.*]. While there, Burke struck up a conversation with Megan Armstrong and Lauren Jolley, who were seated at a table in the suite. [SMF ¶ 3]. Armstrong was 16, Jolley was 17, and Burke was 59. [*Id.*].

Burke had been drinking and was holding an alcoholic beverage. [SMF ¶ 2]. The girls thought Burke seemed intoxicated. [SMF ¶ 5]. After a few minutes, Armstrong left the suite and returned to the arena seating area where her family was watching the game. [*Id.*].[4] Armstrong told her stepfather, Samuel, that she and Jolley had had an uncomfortable encounter with an older, intoxicated man in the suite.[5] [SMF ¶ 5].

---

[3] This statement is drawn from the parties' statements of undisputed facts and from the record, viewed in the light most favorable to Burke, as the nonmoving party. Any fact not supported by citation to the record has been disregarded.

[4] Whether it was Armstrong or Armstrong and Jolley is not material. *See* Resp. to Samuel's Mot. [Doc. No. 91] at 10 n.1.

[5] Exactly what Armstrong told Samuel about the encounter is disputed. Samuel recalls being told that Burke was bothering the teenagers and had rubbed up against Jolley's breasts. Samuel Dep. [Doc. No. 91-3] at 22:20–23, 24:1–4. Burke disputes that he touched Jolley or Armstrong. Armstrong recalled that she told Samuel that Burke was intoxicated and that she and Jolley did not want him talking to them. Armstrong Dep. [Doc. No. 91-1] at 15:12–24. She did not recall if she told her stepfather that Burke had touched her or Jolley. *Id.* at 16:6–8. Jolley testified that she told Samuel she was not comfortable being in the suite alone with Burke. Jolley Dep. [Doc. No. 91-2] at 14:1–10. She also testified Burke did not touch or rub against her breasts but would not say for

Samuel was a Lieutenant with the Oklahoma City Police Department ("OCPD"), but he was not on duty or in uniform at the game. [SMF ¶ 1]. Samuel went up to the suite and asked the BOK president and another employee whether they knew Burke. [SMF ¶ 6]. They did not. [*Id.*]. Samuel could tell Burke was intoxicated: he was unsteady on his feet, his speech was slurred, he had bloodshot eyes, and Samuel could smell an odor of alcohol. [SMF ¶ 8]. Samuel waved down an arena employee and asked her to call for a police officer. [SMF ¶ 9]. Samuel believed Burke had committed the crime of public intoxication. [*Id.*].

Burke left the suite.[6] [SMF ¶ 9]. As he did so, he was approached by two uniformed officers, one of whom was Norton. *See* ¶ 5 of Burke's Statement of Additional Material and/or Disputed Facts ("BAF") in his Resp. to Samuel's Mot. [Doc. No. 91].[7] The officers said to Burke, "Where are you off to?" and one of them said, "Stay right

---

sure there was no physical contact. *Id.* at 12:15–16; 12:22–13:5. The Court resolves this dispute in Burke's favor.

[6] The circumstances under which Burke left the suite are disputed but that he left the suite is not. Samuel testified that he identified himself as an officer and asked Burke repeatedly to leave the suite, but Burke refused and became belligerent. [SMF ¶¶ 6–7]. According to Samuel, Burke eventually stepped out of the suite but stood just outside the doorway and continued to argue with Samuel. [SMF ¶ 9]. Burke's recollection is different. He does not remember any interaction with Samuel; instead, Burke testified he left the suite after talking to Armstrong and Jolley. *See* Plf.'s Resp. to Samuel's Mot. [Doc. No. 91] at 9, ¶ 5. The Court resolves this dispute in Burke's favor.

[7] The statements of additional material facts in Burke's responses to Norton's and Samuel's Motions are identical, although the footnote numbering in the two responses is not. When the Court uses BAF, it is citing to the Response to Samuel unless otherwise noted. With the exception of BAF ¶¶ 6 and 7, these same facts are also included in Burke's response to the City's Motion.

there," and then went through Burke's pockets. This officer placed Burke in handcuffs. *See* ¶ 7 of Norton's Statement of Material Facts ("NMF") in Norton's Mot. [Doc. No. 79]. The officer was not rough when he put handcuffs on Burke, and both uniformed officers behaved in a professional manner. [NMF ¶ 8]. Burke identified the officer who frisked him as Norton, but he was unable to identify the other officer. [BAF ¶ 5 & n.4].

Norton was a sergeant with the OCPD and was working an off-duty extra job at the arena on the night Burke was arrested. [NMF ¶ 1]. Norton was in uniform and was working in the same capacity and enforcing the same City ordinances as if he were on patrol. [*Id.*]. Norton was assigned to the suite level at the arena that night. [SMF ¶ 11]. Norton does not recall whether he was called to respond to the BOK suite or just walked past, but he observed Burke arguing with someone in the concourse outside the suite. [NMF ¶ 11]. Norton also observed that Burke was intoxicated.[8] [SMF ¶ 11; NMF ¶ 13].

Major Brian Jennings also responded to the BOK suite. [SMF ¶ 10]. Jennings was the supervisor in charge of off-duty officers working the game that night, and he observed Burke to be extremely intoxicated. [*Id.*]; *see also* ¶ 23 of City's Material Facts Not in Dispute ("CMF") in City's Mot. [Doc. No. 77]. Jennings noticed that Burke had slurred speech and watery, bloodshot eyes. Jennings also remembered Burke saying that he had been drinking quite a bit and that he had a drink on him. Jennings Dep. [Doc. No. 77-59] at 28:9–17.

---

[8] Burke disputes portions of NMF ¶ 13 (namely, whether Burke himself believed he was intoxicated), but he does not dispute that Norton observed him to be intoxicated.

Samuel told the officers who responded to the suite that Burke had been harassing his daughter and had become belligerent when asked to leave; he asked the officers to take care of the situation. [SMF ¶ 12]; *see also* Samuel Dep. [Doc. No. 80-1] at 45:7–11. Samuel admits that he was acting under color of state law and within his authority as a police officer at all relevant times. *See* Samuel's Answer [Doc. No. 40] at ¶ 2.

Burke was escorted downstairs to the Chesapeake Security Office, and an incident report was prepared. [NMF ¶¶ 14, 15]. The report indicated that Burke was an intoxicated patron, that the matter had been assigned to the police, and that the resolution was "Detox." [NMF ¶ 15]; Incident Report [Doc. No. 79-6]. Samuel did not leave the suite level with Burke, and he eventually left the game with his family. [SMF ¶ 14].

**B. Burke's Injuries**

Norton called 911 at approximately 9:30 p.m. and requested an on-duty officer come to the arena to transport Burke to the City's Public Inebriate Alternative facility, commonly known as Detox. [NMF ¶ 16]. Norton and another, unknown officer waited with Burke outside the arena. [NMF ¶ 17]. During the wait, Burke sat down on a low, decorative wall outside the arena, still handcuffed. [*Id.*]; Burke Dep. [Doc. No. 79-3] at 90:15–22. The wall was tall enough that Burke's feet did not touch the ground when seated. *See* Photographs [Doc. No. 79-8]; Burke Dep. [Doc. No. 89-5] at 150:12–151:14.

When the police transport arrived, Burke attempted to scoot forward off the wall. As he did so, one of the officers grabbed Burke's right shoulder and pushed him from behind. [NMF ¶ 18]; Burke Dep. [Doc. No. 79-3] at 96:21–99:5. Burke does not know which officer pushed him. [NMF ¶ 18]. As a result of the push, Burke lost his balance

and fell forward, landing on the ground on his left side, face down. [*Id.*]; *see also* Burke Dep. [Doc. No. 79-3] at 103:5–12; Burke Dep. [Doc. No. 89-5] at 150:19–151:14. Burke has no reason to believe the officer threw him to the ground on purpose. [NMF ¶ 18]; *see also* Burke Dep. [Doc. No. 79-3] at 97:13–17 ("Q. Do you believe they were trying to throw you to the ground? Or do you believe this was just, I mean, an accident? A. I don't think – have any reason to believe they did it on purpose.").

After the fall, Burke was in a lot of pain. [NMF ¶ 19]. He moaned from the sudden impact of the fall and had tears in his eyes. Burke Dep. [Doc. No. 89-5] at 151:3–9; 153:6–15. He also had to take slower, shallow breaths because of the pain.[9] Burke Dep. [Doc. No. 89-5] at 152:17–153:24. Burke testified that he was "not real sure" what he said to the officers, *id.* at 133:6–15, and he also stated that "because [he] was in so much pain, [he] wasn't talking to anybody," *id.* at 104:19–22. In follow-up questioning, however, Burke testified that he told the officers he was in a lot of pain,[10] and he thought it likely he would have said he was hurt. *See id.* at 133:16–22 ("Q. . . . You don't recall what you asked the officers, as you were sitting outside on the concrete wall or in the patrol unit, correct? A. I would think it very likely that I would have said, 'I'm hurt.' Q.

---

[9] Burke asserts that he repeatedly told Norton he was having trouble breathing. *See* Resp. to Norton's Mot. [Doc. No. 89] at 12, ¶ 10. However, the evidentiary materials he cites do not support that assertion.

[10] *See id.* at 106:20–24 ("Q. Okay. Did you tell them to take you somewhere? A. I told them, 'I'm in a lot of pain.' I didn't know at the – at the time, that my ribs were broken. Q. Sure. Okay. So what did you tell them? A. I said, 'I'm – I'm in a lot of pain here.'"); *id.* at 152:15–16 ("A. My recollection is I made it pretty clear that I was hurt.").

Is that it? A. That's it."). Burke also recalled mentioning to Norton and the other officer that he needed to go to the hospital. *Id.* at 134:1–23.

The officers helped Burke off the ground in a matter of seconds and assisted him into the waiting police car. [NMF ¶ 18]; *see also* Burke Dep. [Doc. No. 89-5] at 152:3–11. They did not attempt to determine if Burke had been injured, and they did not call anyone to see whether or not Burke was injured. *See* Burke Dep. [Doc. No. 89-5] at 151:15–152:11.

Officer Gregory Salyers transported Burke to Detox. [NMF ¶ 20]. Burke was checked in at 10:09 p.m., and his blood alcohol level ("BAC") was recorded as .141. [*Id.*]; *see also* Detox Log [Doc. No. 79-11]. Burke told Detox staff several times that he was injured, and Detox staff eventually called EMSA. [NMF ¶ 21]. Burke was checked out of Detox at 11:40 p.m., and EMSA transported him to St. Anthony hospital. [*Id.*]; *see also* Detox Log [Doc. No. 79-11]. Burke was diagnosed with three broken ribs. [NMF ¶¶ 19, 21; SMF ¶ 16]; *see also* Burke Dep. [Doc. No. 79-3] at 104:9–10. Burke also had contusions and swelling to his left wrist. *See* Burke Dep. [Doc. No. 89-5] at 141:8–11. Lab results from the hospital showed that Burke's BAC was in the "critical" range. [NMF ¶ 21; SMF ¶ 16]; *see also* Lab - Lab Results, Alcohol Ethyl Blood [Doc. No. 79-12].

### C. Alleged Police Cover-up

Neither Norton nor Samuel prepared a report of Burke's arrest. [NMF ¶ 24; SMF ¶ 14]. Later, Norton could not recall many of the details of Burke's arrest, including who made the decision to arrest Burke or who was with Norton when Burke was arrested (other than Samuel). [BAF ¶¶ 2, 6–8]. Samuel and Jennings also could not recall the

identities of the officers who responded to the BOK suite, although they could recall other details—like Burke's interaction with Armstrong and Jolley. [BAF ¶¶ 3, 4].

### D.  Relevant Municipal Policies and Customs

The OCPD has a specific procedure for responding to calls involving public intoxication and alternative treatment programs like Detox. [CMF ¶ 11]. Specifically, OCPD Procedure 265.10 provides that officers shall use Detox instead of proceeding with an arrest if Detox is available and if the intoxicated person and the facility consent:

> Where the Department of Mental health or the governing body of any municipality has approved a program alternative (PIA) to statutory or municipal requirements of prosecution and imprisonment of intoxicated persons, such facility will be utilized until the capacity to accommodate intoxicated persons has been exceeded in the facility. The officer involved in detaining an intoxicated individual shall utilize such alternative treatment program upon the voluntary approval of the intoxicated person and the receiving facility rather than proceeding with an arrest under the statutory or municipal laws pertaining to prosecution and imprisonment of intoxicated persons.

[Doc. No. 77-40]. It is the OCPD's policy not to make an arrest report for public intoxication unless the person is taken to jail, rather than Detox. [CMF ¶ 24]; *see also* Jennings Dep. [Doc. No. 77-59] at 13:4–14:9.

When an arrested person requires medical attention, OCPD Procedure 233.0 provides that an "officer's first priority is to ensure that the medical attention is received as rapidly as possible." [Doc. No. 77-45]. Additionally, "[w]hether the injury was a result of the arrest or sustained prior to arrest, the name of the treating facility, attending physician and extent of injuries will be indicated on the offense report." [*Id.*].

With respect to uses of force, OCPD Rule 348.0 provides that "[e]mployees will refrain from the use of physical force to any degree where total compliance is adhered to." [Doc. No. 77-48]. If an off-duty officer uses force, OCPD Procedure 150.01 requires the officer to advise an on-duty supervisor. [CMF ¶ 25]; *see also* [Doc. No. 77-16]. OCPD policy requires an investigation of any use of force beyond routine handcuffing. [CMF ¶ 12]; *see also* OCPD Procedure 150.0 [Doc. No. 77-16]. For uses of force resulting in no injury or requiring less than in-patient hospitalization,[11] OCPD Procedure 150.10 requires all involved and witnessing employees to notify their on-duty supervisor and complete a report of all facts and circumstances surrounding the incident. [Doc. No. 77-16]. Even if an arrest report is not applicable, Procedure 150.10 directs that the involved/witnessing employee must complete a supplemental report containing the following information: (1) date, time, and place of occurrence, (2) the identity and description(s) of all known persons at the scene, and (3) a full and detailed description of events and all force used or witnessed, including whether or not injury was sustained. [*Id.*].

Other City policies also require written reports. For example, OCPD Policy 290.20 requires an off-duty officer to notify an on-duty supervisor and make a detailed written report when the off-duty officer "uses his peace officer authority or becomes involved in

---

[11] "In-patient hospitalization" is defined as "admission requiring more than E.R. treatment and release." OCPD Procedure 150.10 [Doc. No. 77-16].

a situation, which may reflect negatively on or cause involvement of the [OCPD]." [Doc. No. 77-51].

The City has formal rules prohibiting officers from testifying, making reports, or conducting business in a less than truthful and cooperative manner. *See* OCPD Rule 120.0 [Doc. No. 77-47].

## V.   DISCUSSION

The Court considers Burke's federal constitutional claims first, followed by his state-law negligence claims. To avoid unnecessary duplication of analysis, the Court addresses Norton's and Samuel's arguments together on the federal claims and then all Defendants together on the state-law claims.

### A. Constitutional Claims Against Samuel and Norton

#### 1. Unlawful Arrest

"A warrantless arrest is permissible only if an officer has probable cause to believe that the arrestee committed a crime." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 645 (10th Cir. 2017). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* (citation omitted). This "flexible, common-sense standard" does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable. *Texas v. Brown*, 460 U.S. 730, 742 (1983).

When a defendant asserts qualified immunity on a claim of unlawful arrest, "not only must the plaintiff demonstrate that the officer arrested [him] without probable cause (that is, that he violated a constitutional right), but also that it would have been clear to a reasonable officer that probable cause was lacking under the circumstances (that is, that the right was clearly established in the specific situation)." *Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011). Accordingly, "[a] defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (citation omitted).

Samuel and Norton contend that they are entitled to qualified immunity under this standard because there was probable cause to arrest Burke for public intoxication or, alternatively, because it would not have been clear to a reasonable officer that probable cause for that crime was lacking.[12]

Public intoxication is a misdemeanor crime under Oklahoma law. At the time of Burke's arrest, Oklahoma law provided as follows:

> [I]f any person shall be drunk or intoxicated in . . . any public place or building, or at any public gathering, from drinking or consuming such intoxicating liquor,

---

[12] Burke does not contest that Samuel and Norton are entitled to assert qualified immunity. Although Samuel and Norton were off-duty at the time of Burke's arrest, they admit that they were acting under color of state law during their encounter with Burke. *See* Samuel's Answer [Doc. No. 40] at ¶ 2 (admitting Burke's allegation that he was acting under color of state law); Norton's Answer [Doc. No. 34] at ¶ 2 (same). If they were not acting under color of law, there would be no basis for § 1983 liability. *See* 42 U.S.C. § 1983; *see also Galindo v. Town of Silver City*, 127 F. App'x 459, 467 (10th Cir. 2005) (unpublished) (summary judgment was appropriate because a person must be acting under color of law to be held liable under § 1983).

intoxicating substance or intoxicating compound . . . he shall be guilty of a misdemeanor . . . .

37 Okla. Stat. § 8.[13] "The condition of being in a state of intoxication is a matter of general knowledge, the meaning of which is sufficiently settled and commonly understood . . . ." *Findlay v. City of Tulsa*, 561 P.2d 980, 984 (Okla. Crim. App. 1977) (quotation omitted). "The 'outward manifestations' of intoxication are 'impaired mental judgment and physical responses.'" *Rife*, 854 F.3d at 645 (quoting *Findlay*, 561 P.2d at 984).

Burke does not dispute he was intoxicated or that Samuel and Norton observed him to be intoxicated. Nor does he contest that he was in a public place. Indeed, the undisputed testimony of multiple witnesses—including Samuel, Norton, Jennings, Armstrong, and Jolley—was that Burke was visibly intoxicated at the Oklahoma City Thunder game on April 4, 2017. Jolley and Armstrong thought Burke seemed intoxicated when he sat down to talk to them, and Burke was holding an alcoholic beverage. Samuel observed that Burke was unsteady on his feet and had slurred speech and bloodshot eyes, and Samuel could smell an odor of alcohol. Jennings also observed that Burke's speech was slurred and that he had bloodshot, watery eyes. He also recalled Burke holding an alcoholic beverage. Norton likewise remembers that Burke was intoxicated, although he was unable to recall during his deposition which signs of intoxication he observed. *See* Norton Dep. [Doc. No. 79-1] at 54:11–21. Finally, Burke himself testified that he had had

---

[13] This statute was repealed effective September 30, 2018; public intoxication is now punishable under 37A Okla. Stat. § 6-101(A)(8) and (D).

two or three cocktails that evening and was holding an alcoholic beverage just prior to his

arrest. Burke Dep. [Doc. No. 79-3] at 68:6–14, 120:9–10. Moreover, when Burke was

taken to Detox, his BAC was .141, and his BAC was in the "critical" range when it was

measured at the hospital hours later. *See id.* at 119:24–120:5; Detox Log [Doc. No. 79-

11]; Lab - Lab Results, Alcohol Ethyl Blood [Doc. No. 79-12].

Although he does not contest that he was intoxicated, Burke argues that Samuel

and Norton could not have developed probable cause to arrest him for public intoxication

because they did not conduct a field sobriety test.[14] For this proposition, Burke relies on

*Wilder v. Turner*, 490 F.3d 810 (10th Cir. 2007). In *Wilder*, the Tenth Circuit addressed

whether a police officer had probable cause to arrest a motorist for driving under the

influence of alcohol ("DUI") under Colorado law. The court held that the officer had

reasonable suspicion to detain the motorist for further investigation based on physical

signs of intoxication (a moderate odor of alcohol, pinkish and watery eyes, a flushed face,

unusually slow and deliberate speech, and slow hand movements) and that this suspicion

---

[14] To the extent Burke may also contend that his arrest was unlawful because
Samuel and Norton wanted to punish Burke for "flirting" with Samuel's daughter, the
Court declines to consider such argument because it was raised in only a cursory fashion,
without argument or analysis. *But see Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)
("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to
the existence of probable cause. That is to say, his subjective reason for making [an]
arrest need not be the criminal offense as to which the known facts provide probable
cause.") (citations omitted); *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019) (holding in First
Amendment context that probable cause defeats a claim for retaliatory arrest absent
objective evidence that similarly situated individuals who had not engaged in the same
type of protected speech as the plaintiff had not been arrested).

developed into probable cause when the plaintiff twice refused to participate in a field sobriety test. *Wilder*, 490 F.3d at 815.

Burke argues that *Wilder* establishes a sobriety-test requirement. But this goes too far. The *Wilder* court indeed found that a driver's refusal to submit to a sobriety test gave rise to probable cause in that case, but it does not necessarily follow that a sobriety test (or a suspect's refusal to submit to such a test) is *necessary* in every case. *Cf. Rife*, 854 F.3d at 646 (characterizing sobriety tests as "additional evidence" that supported a finding of probable cause for public intoxication under Oklahoma law).

Additionally, the crime at issue in *Wilder* was DUI under Colorado law, not public intoxication. Under Colorado law, DUI requires that a person's alcohol consumption "affect[ ] the person to a degree that the person is substantially incapable, either mentally or physically, or both mentally and physically, to exercise clear judgment, sufficient physical control, or due care in the safe operation of a vehicle." Colo. Rev. Stat. Ann. § 42-4-1301. By contrast, the crime of public intoxication under Oklahoma law requires only that a person be intoxicated in a public place. *See Rife*, 854 F.3d at 645 (citing 37 Okla. Stat. §§ 8, 537(A)(8)).

Although it is federal law that governs a claim of false arrest under the Fourth Amendment, and a federal court is not bound by a state court's interpretation of federal law, the court may look to state law for guidance as to the validity of an arrest. *See Wilder*, 490 F.3d at 814 (citing *Wells v. Ward*, 470 F.2d 1185, 1187 (10th Cir. 1972)). In this regard, the Oklahoma Court of Criminal Appeals has held that there is no requirement that an officer administer a breathalyzer or other formal test to support a

21

finding of probable cause for public intoxication; rather, "the symptoms of intoxication are [ ] a matter of common knowledge and understanding . . . ." *Findlay*, 561 P.2d at 984. *Accord Gutierrez v. Kermon*, 722 F.3d 1003, 1012 (7th Cir. 2013) ("There is no litmus test for determining whether a person meets this definition [of intoxication], but common indicia of intoxication include (1) the consumption of [a] significant amount of alcohol; (2) impaired attention and reflexes; (3) watery or bloodshot eyes; (4) the odor of alcohol on the breath; (5) unsteady balance; (6) failure of field sobriety tests; [and] (7) slurred speech. These are merely indicia of impairment and not all of them need to be present for a person to be deemed impaired (and thus intoxicated)."). *Cf. Martinez v. Beggs*, No. CIV-07-132-F, 2008 WL 200261, at *8 (W.D. Okla. Jan. 24, 2008), *aff'd*, 563 F.3d 1082 (10th Cir. 2009) (observing in context of claim for deliberate indifference to serious medical needs that "law enforcement agencies are not required to administer blood and breath tests, even at a defendant's request, prior to arresting a defendant for public intoxication").

Consistent with this approach, the Oklahoma Court of Criminal Appeals has upheld arrests for public intoxication in the absence of any sobriety test. For example, probable cause for public intoxication has been found where the suspect had bloodshot eyes and an odor of alcohol on his breath, *Smith v. State*, 695 P.2d 1360, 1361–62 (Okla. Crim. App. 1985), *overruled on other grounds by Kaulaity v. State*, 859 P.2d 521, 523 (Okla. Crim. App. 1993); where the suspect had a dazed look on his face, his eyes were dilated and bloodshot, he had an odor of alcohol on his breath, his speech was slurred, and he staggered, *Findlay*, 561 P.2d at 981–85; and where an officer detected a strong

odor which he associated with alcoholic beverage and noticed that the suspect's speech was slurred, *Staub v. State*, 526 P.2d 1155, 1156–57 (Okla. Crim. App. 1974). *Cf. Clark v. State*, 527 P.2d 347, 349 (Okla. Crim. App. 1974) (upholding public intoxication conviction of defendant who was arrested *prior* to any sobriety test after officers noticed an odor of alcohol on his breath and that his eyes were dilated, he staggered, and his speech and attitude were not that of a sober person).

Burke does not dispute that Norton and Samuel observed him to be intoxicated outside the BOK suite at the Thunder game. And indeed the undisputed testimony of multiple witnesses confirms that Burke showed signs of visible intoxication—including slurred speech, an unsteady gait, bloodshot eyes, and an odor of alcohol—at the time of his arrest. The Court concludes that these undisputed facts would warrant a man of reasonable caution to believe that Burke was intoxicated in public, in violation of Oklahoma law. At a minimum, it would not have been clear to a reasonable officer that probable cause was lacking under the circumstances. For these reasons, Norton and Samuel are entitled to qualified immunity on Burke's claim for unlawful arrest in violation of the Fourth Amendment.

### 2. Excessive Force

"Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment, depending on where the plaintiff finds himself in the criminal justice system at the time of the challenged use of force." *McCowan v. Morales*, 945 F.3d 1276, 1282–83 (10th Cir. 2019) (citation omitted). When the challenged force occurs after the plaintiff was arrested without a warrant but before any judicial determination

was made as to whether there was probable cause to charge him with a crime, the Fourth Amendment applies. *Id.* at 1283.

"A Fourth Amendment excessive-force claim is governed by a purely objective standard: 'A police officer violates an arrestee's . . . Fourth Amendment right to be free from excessive force during an arrest if the officer's actions were not "objectively reasonable" in light of the facts and circumstances confronting him.'" *Id.* (quoting *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1213 (10th Cir. 2019)). To determine whether a use of force is objectively unreasonable, the court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Relevant considerations include: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).

Here, Burke contends that it was objectively unreasonable for an officer to push him as he was attempting to get up and go to a transport vehicle while handcuffed and cooperative. Samuel and Norton do not argue otherwise, but they emphasize that there is no evidence either of them pushed Burke. Samuel, for example, points out that he did not go outside with Burke but instead stayed on the suite level and left with his family. Norton acknowledges that he was present when Burke was pushed, but he contends that Burke cannot prove it was Norton who did the pushing. He points to Burke's testimony,

which establishes that only one officer touched Burke, and he notes that Burke has never identified Norton as the pusher.

"To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, a plaintiff must establish the defendant acted under color of state law and caused or contributed to the alleged violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Burke concedes that he lacks evidence supporting an excessive force claim against Samuel. *See* Resp. to Samuel's Mot. [Doc. No. 91] at 16. Given this concession, as well as the undisputed fact that Samuel was not present when Burke was pushed, the Court finds that Samuel is entitled to judgment on Burke's excessive force claim.

Burke also seemingly concedes that he cannot prove Norton pushed him either. Rather than point to evidence from which a jury could find that Norton pushed him, he argues only that Norton prevented him from learning the identity of the other officer. He also asserts in passing, and without citation to any authority, that "[w]hen two or more officers are involved in intentional actions which result in a detainee's injuries, and only one officer actually touched the detainee, then all of the officers may be liable for either the attack, or a failure to take action to stop that attack." Resp. to Norton's Mot. [Doc. No. 89] at 22.

The Court finds these arguments unpersuasive. Burke's inability to identify the other officer present does not prevent him from indicating which of the two men— Norton or the unknown officer—pushed him. And while it is true that an officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983, *see Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008), Burke

points to no facts showing Norton could have intervened, and he neither cites nor analyzes any pertinent authority that would support liability under the circumstances of this case. Taking the facts in the light most favorable to Burke, an officer grabbed Burke's shoulder as he was getting up off a wall and pushed "too hard." That singular push is the only use of force Burke challenges. And there are no facts suggesting Norton knew the push was forthcoming or that it would be "too hard." Absent some evidence of an ongoing constitutional violation or other relevant facts, it is not apparent how Norton could have intervened. Burke offers no theories.

Norton's personal participation—whether by direct involvement or a failure to intervene—is an essential element of Burke's excessive force claim against Norton. *See Fogarty*, 523 F.3d at 1162. In moving for summary judgment, Norton has pointed out an absence of evidence on this essential element. The burden thus shifted to Burke, as the party opposing summary judgment, "to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Herrera*, 506 F.3d at 1309 (cleaned up). Burke has not done so, and therefore the Court finds that Norton should be granted summary judgment on Burke's claim of excessive force. *See* Fed. R. Civ. P. 56(e); *cf. Saucier v. Katz*, 533 U.S. 194, 211 (2001) (Ginsburg, J. concurring) (finding summary judgment proper because plaintiff failed to proffer proof, after pretrial discovery, that Saucier, as distinguished from his fellow officer, had a hand in the allegedly violent shove).

In the alternative, the Court concludes that Norton is entitled to qualified immunity because Burke has not shown that it was clearly established in April 2017 that

26

the Fourth Amendment prohibited Norton from pushing Burke in the situation he confronted.[15]

When an officer asserts qualified immunity on an excessive force claim, a plaintiff must show both that the force used was not objectively reasonable (i.e., a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (i.e., clearly established law). *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007). As the Supreme Court has explained, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (cleaned up).

A constitutional right is clearly established if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Here, a "case clearly establishes a right when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts

---

[15] Although Norton asserts qualified immunity on Burke's excessive force claim, *see* Norton's Mot. at 24, his Motion focuses on insufficient evidence of a constitutional violation and does not address whether the alleged conduct was a violation of clearly established law. However, Burke expressly addresses both prongs of the qualified immunity analysis, and Norton also addresses the clearly established prong at length in his Reply. *See* Reply [Doc. No. 97] at 19–20. The Court thus finds it proper to consider both prongs of Norton's qualified immunity defense. *See Cox v. Glanz*, 800 F.3d 1231, 1244–45 (10th Cir. 2015) (addressing qualified immunity despite defendant's briefing shortcomings); *see also Frasier v. Evans*, 992 F.3d 1003, 1028 (10th Cir. 2021) (same, and noting that an insufficient evidence defense is a "typical qualified-immunity argument"); *Rife v. Jefferson*, 742 F. App'x 377, 381 n.4 (10th Cir. 2018) (unpublished) (same).

shows that the right must be as the plaintiff maintains." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (cleaned up). However, courts should not define "clearly established" at a "high level of generality." *Aldaba v. Pickens*, 844 F.3d 870, 872 (10th Cir. 2016) (citing *Mullenix*, 577 U.S. at 12). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bond*, 595 U.S. at 12 (cleaned up). "Such specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 12–13 (cleaned up). The correct inquiry, which must be undertaken in light of the specific context of the case, is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [he] confronted.'" *Aldaba*, 844 F.3d at 873 (quoting *Mullenix*, 577 U.S. at 13).

Here, Norton had arrested Burke for public intoxication and was waiting with him for a police transport to Detox. During this wait, Burke seated himself on a concrete wall high enough that his feet could not touch the ground. His hands were handcuffed behind his back. When the transport vehicle arrived, Burke attempted to scoot forward off the wall to go to the vehicle. Norton and another officer came over to where Burke was seated, and one of them "grabbed [Burke's] shoulder [,] [a]t which point, [he] lost [his] balance and fell to the ground." Burke Dep. [Doc. No. 79-3] at 96:21–23; *see also id.* at 97:10-12 (stating that "I was getting down to come to the transport and they had me by the shoulder and that's when I fell to the ground"). As Burke explained, "when the officer

said, 'Let's go,' that's when I kind of scooted forward. And then, when I was doing that, that's when the officer pushed me from behind." Burke Dep. [Doc. No. 91-5] at 150:21–23. Burke testified that the officers "pushed [him] too hard off . . . the wall" and that the push was what caused him to fall. *Id.* at 98:8–10; *see also id.* at 150:24–151:1.

Burke argues that it was objectively unreasonable for an officer to grab and push Burke when he was restrained and attempting to comply with officers' directives. And he also argues that the use of gratuitous force against a fully compliant, restrained misdemeanant is a clearly established violation of the Fourth Amendment.

For this proposition, Burke relies on *McCowan v. Morales*, 945 F.3d 1276 (10th Cir. 2019).[16] There the plaintiff was pulled over for driving without headlights and was arrested after performing poorly on a sobriety test. 945 F.3d at 1280. The arresting officer handcuffed the plaintiff, placed him in the backseat of his police vehicle, and then drove the plaintiff to the police station. *Id.* The plaintiff was not buckled in, and as a result of the officer's fast, jerky driving, he was repeatedly slammed throughout the backseat "like

---

[16] Norton objects that *McCowan* cannot be the basis for clearly established law in this case because it was decided in 2019, after the events at issue here. Reply [Doc. No. 97] at 19. *See Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (explaining that when judicial decisions "postdate the conduct in question," they are incapable of "giv[ing] fair notice" to government officials and "are of no use in the clearly established inquiry"); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (explaining that the focus is on "the backdrop of the law at the time of the conduct"). The Court agrees. But a discussion of *McCowan* is still useful because of its extensive discussion of Tenth Circuit precedent predating the events in this case. *See also* Reply [Doc. No. 97] at 19 (conceding the cases discussed in *McCowan* are instructive).

a ping pong ball." *Id.* The plaintiff begged the officer to slow down, but the officer

laughed and continued to speed. *Id.*

In *McCowan*, the officer asserted qualified immunity on the plaintiff's excessive

force claim, arguing that it was not clearly established in August 2015 that the Fourth

Amendment prohibited an officer from driving recklessly so that he knowingly "tossed

about" a handcuffed but otherwise unrestrained arrestee in the backseat of his patrol car.

*Id.* at 1286. On appeal, the Tenth Circuit found this framing of the issue too narrow.

Instead, the Tenth Circuit held that the relevant inquiry was whether there was precedent

giving the officer "notice that the gratuitous use of force against a fully compliant,

restrained, and non-threatening misdemeanant arrestee was unconstitutional." *Id.* The

court concluded that there was such precedent, citing *McCoy v. Meyers*, 887 F.3d 1034

(10th Cir. 2018) and the three cases *McCoy* relied on.

In *McCoy*, officers seized the plaintiff during an armed hostage situation by

bringing him to the ground, knocking him unconscious with a carotid artery maneuver,

handcuffing his arms behind his back, zip-tying his legs together, and placing him in a

seated position. 887 F.3d at 1038. When the plaintiff regained consciousness, the officers

resumed striking him and placed him into a second carotid restraint, rendering him

unconscious a second time. *Id.* The *McCoy* court concluded that a jury could find that the

force officers used *after* restraining the plaintiff was excessive. *Id.* at 1051–52. The court

further held that the officers were not entitled to qualified immunity because preexisting

Tenth Circuit precedent made it clear that "the use of force on effectively subdued

individuals violates the Fourth Amendment." *Id.* at 1052.

The *McCoy* court relied on three cases: *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) (finding it clearly established that officers could not lay on a suspect's legs and kneel on his back after he was restrained and subdued, where officers knew such force could cause asphyxiation); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (finding it clearly established that officers could not tackle, tase, and beat a citizen who was peacefully attempting to return to the courthouse with a court file he should not have removed); and *Dixon v. Richer*, 922 F.2d 1456, 1462–63 (10th Cir. 1991) (holding that it was unreasonable for officer to kick a man, hit him in the stomach with a flashlight, and then choke and beat him where officers did not suspect him of committing a crime but had stopped him just to ask about another individual, and the man had already been frisked, "had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats"). Although not factually identical, the court found its prior precedents analogous, noting that the cases "all share the decisive factual circumstance that the defendants used excessive force on the plaintiff when he was already subdued." *McCoy*, 887 F.3d at 1052–53.

Based on *McCoy* and the precedents on which it relied, the court in *McCowan* concluded that the defendant officer was not entitled to qualified immunity on the plaintiff's excessive force claim based on the "rough ride" the plaintiff took in the back of the officer's patrol car. *McCowan*, 945 F.3d at 1289. In reaching this decision, the court noted that "[i]t seemed clear and well established to our court in *McCoy* that when an officer inflicts gratuitous force against a fully compliant and subdued arrestee he is not

protected by qualified immunity even though there has not yet been a case involving the precise manner that the officer chose to inflict that unconstitutional force." *Id.* at 1287.

Burke seizes on this language, arguing that it would have been clear to an officer in Norton's position that gratuitous force against a restrained and fully compliant detainee was a clearly established violation of the Fourth Amendment. The trouble with this statement is that it presumes, without analysis of the relevant precedents, that the force used against Burke was "gratuitous." *Cf. City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 615–16 (2015) (observing that even if precedent clearly establishes that it is "unreasonable to forcibly enter the home of an armed, mentally ill suspect who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry," officers would still be entitled to qualified immunity where precedent did not establish that officers did not have "an objective need for immediate entry" in that case).

Burke suggests that Norton pushed him to the concrete and "punish[ed]" him by breaking his ribs. *See* Resp. to Norton's Mot. [Doc. No. 89] at 31. But the evidence does not support such an inference, and the arguments of counsel cannot take the place of evidence lacking in the record. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.9 (1981). Burke's testimony was not that Norton intentionally threw him to the ground and punished him while he was subdued; rather, he testified that when a police transport vehicle arrived, an officer "grabbed" Burke's shoulder as he was trying to get down from the wall on which he was sitting and pushed him "too hard," causing him to lose his balance. *See* Burke Dep. [Doc. No. 79-3] at 97:9–12, 16–17 ("All I know is they grabbed

32

my shoulder and – and I was getting down to come to the transport and they had me by the shoulder and that's when I fell to the ground. . . . I don't think – have any reason to believe they did it on purpose.").

Even if a jury might find that push unreasonable under the circumstances, it is still qualitatively different than the use of force in *Weigel*, *Casey*, and *Dixon*. It is likewise distinguishable from the facts and circumstances in *McCoy* and *McCowan*. Both *McCowan* and *McCoy* noted the lack of any law-enforcement purpose for the officers' uses of force. In *McCowan*, for example, the court explained that "[t]here was no law enforcement necessity nor reason even advanced for the 'rough ride' that resulted in McCowan being slammed from side to side in the police car." 945 F.3d at 1286. And in *McCoy*, the court relied on the fact that officers continued to strike the suspect after he was fully restrained and posed no safety threat to them. 887 F.3d at 1051–52. Here, by contrast, there was an apparent law-enforcement purpose for an officer to grab Burke's shoulder and push him—namely, to get Burke, who was intoxicated and trying to scoot himself off of a wall, onto his feet and over to a waiting police vehicle.

Given these distinctions, the Court concludes that neither *McCowan* nor the precedent it relies on would put a reasonable officer on notice that he could not grab a restrained and compliant arrestee's shoulder and push him toward a waiting police vehicle. *Cf. Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) ("We have little difficulty concluding that a small amount of force, like grabbing [the suspect] and placing him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."); *Saucier v. Katz*, 533 U.S. 194, 208–09 (2001) (finding that even a

"gratitously violent shove" was not excessive force, where the purpose was to hurry a suspect into a van and officer believed the suspect posed a threat to the Vice President and there was cause for urgency), *receded from by Pearson v. California*, 555 U.S. 223 (2009); *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Burke has not pointed the Court to any other relevant precedent showing that Norton's conduct was a clearly established violation of the Fourth Amendment. Accordingly, Norton is entitled to qualified immunity on Burke's excessive force claim, and the Court declines to decide whether Norton's use of force amounted to a violation of the Fourth Amendment.

### 3. Deliberate Indifference to Serious Medical Needs

Burke also claims that Norton's and Samuel's failure to provide prompt medical care after his fall violated his rights under the Fourteenth Amendment.

Samuel seeks summary judgment on this claim for the same reason as the excessive force claim—i.e., he was not present when Burke was injured—and Burke concedes that he lacks evidence to support a claim against Samuel for denial of medical care. *See* Resp. to Samuel's Motion [Doc. No. 91] at 16. Accordingly, the Court finds that Samuel is entitled to summary judgment on this claim.

Norton, for his part, claims qualified immunity. He contends that a jury could not find a constitutional violation, and he also argues that any duty to recognize the need for

medical care based on non-visible injuries and non-specific complaints was not clearly established.

The Due Process Clause of the Fourteenth Amendment "entitles pretrial detainees to the same standard of medical care owed to convicted inmates under the Eighth Amendment." *Rife*, 854 F.3d at 647. "Thus, the Fourteenth Amendment is violated if state officials are deliberately indifferent to a pretrial detainee's serious medical needs." *Id.*

Courts apply a two-part test for deliberate indifference claims. "Under this test, a plaintiff must satisfy an objective prong and a subjective prong." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837–40 (1994)). The objective prong focuses on the objective, sufficiently seriousness of a plaintiff's medical need, whereas the subjective prong concerns the defendant's state of mind. *Id.*

"The objective component of deliberate indifference is met if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (cleaned up). A medical need is sufficiently serious if the condition "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (citation omitted). A delay in medical care rises to the level of an Eighth Amendment violation only where the plaintiff can show that the delay resulted in "substantial harm," which may be satisfied by a showing of lifelong handicap,

permanent loss, or considerable pain. *Requena v. Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018) (citation omitted).

The subjective component is met if the official knew of and disregarded an excessive risk to inmate health or safety. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "[T]he official must [have been] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also [have] draw[n] the inference." *Id.* (alterations added) (citation omitted).

Accordingly, for Burke to establish a constitutional violation based on deliberate indifference to serious medical needs he must set forth facts demonstrating that his medical need was objectively sufficiently serious, and that Norton's delay in meeting that need caused him substantial harm. *See id.* at 752. Then, to meet the subjective prong, Burke must provide evidence supporting an inference that Norton knew about and disregarded a substantial risk of harm to his health and safety. *Id.*

Additionally, to avoid qualified immunity, Burke must show that Norton's conduct violated clearly established law. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). Burke need not identify a case "exactly on point." *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (explaining that plaintiff can demonstrate right was clearly established even if "'the very action in question'" hasn't "'previously been held unlawful'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). "[B]ut existing precedent must have

36

placed the . . . constitutional question beyond debate." *Mullenix*, 577 U.S. at 12; *see also*

*Anderson*, 483 U.S. at 640 ("[I]n the light of pre-existing law the unlawfulness must be

apparent."). Moreover, clearly established law must be "particularized to the facts of the

case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). In other words, Burke must

identify a case in which a defendant "acting under similar circumstances as" Norton "was

held to have violated" the Eighth or Fourteenth Amendments. *Id.*

Despite bearing the burden to show clearly established law, Burke makes no more

than a passing attempt to carry this burden, merely asserting in bare-bones fashion that

"deliberate indifference to Plaintiff's pain and suffering and the delay of medical care are

clearly established violations of the Fourteenth Amendment." Resp. to Norton's Mot.

[Doc. No. 89] at 36. But "except in the most obvious cases, broad, general propositions of

law are insufficient to suggest clearly established law." *Weise*, 593 F.3d at 1167.

Burke does virtually nothing to define the contours of clearly established law as

particularized to the facts of this case. Burke cites a handful of cases for the general

proposition that substantial pain is a sufficiently serious medical need under the Eighth

Amendment and that delays in providing medical care may amount to a constitutional

violation where they unnecessarily prolong such pain. But he does not discuss a single

case in which a defendant was found to have violated the Eighth or Fourteenth

Amendments under circumstances similar to those here. "On this basis alone, [the Court]

could hold that [Burke] has not properly laid the groundwork to defeat [Norton]'s

assertion of qualified immunity." *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015);

*see also id.* at 1247 n.8 (10th Cir. 2015) (plaintiff "cannot discharge [his] burden by relying upon authorities that do no more than establish general legal principles . . .").

Of the cases Burke cites in passing, only three were decided before the relevant conduct here:[17] *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005); *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000); and *Al-Turki v. Robinson*, 762 F.3d 1188 (10th Cir. 2014). Although Burke does not discuss the facts of any of these cases—and thus "necessarily fails to demonstrate that [they are] '"particularized" to the facts' present here," *Rife v. Jefferson*, 742 F. App'x 377, 387 (10th Cir. 2018) (unpublished) (quoting *White*, 580 U.S. at 79)—the Court has reviewed those cases in the interest of thoroughness.

*Mata*, *Sealock*, and *Al-Turki* each concerned prison officials who delayed medical treatment to prisoners complaining of severe pain (chest pain consistent with heart attack, in the cases of *Mata* and *Sealock*, and abdominal pain, in the case of *Al-Turki*). *Mata* and *Al-Turki* are inapposite because the defendants in those cases were medical professionals, *see Mata*, 427 F.3d at 750 and *Al-Turki*, 762 F.3d at 1190, and the Tenth Circuit has held that medical professionals are subject to different standards than lay people like Norton, *see Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). Accordingly, neither *Mata* nor *Al-Turki* could have put Norton on notice that his conduct

---

[17] *See Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (explaining that when judicial decisions "postdate the conduct in question," they are incapable of "giv[ing] fair notice" to government officials and "are of no use in the clearly established inquiry"); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").

violated the Fourteenth Amendment. *See Rife v. Jefferson*, 742 F. App'x 377, 388 (10th Cir. 2018) (unpublished).

Two of the defendants in *Sealock* were also medical professionals, but two were prison guards. The *Sealock* court reversed summary judgment for one of those guards on the Eighth Amendment claim when (1) the plaintiff and his cellmate both informed the guard "that [the plaintiff] was or might be having a heart attack"; (2) the guard "was present when [the plaintiff] displayed symptoms consistent with a heart attack"; and (3) the guard nevertheless "refused to transport [the plaintiff] immediately to a doctor or a hospital." 218 F.3d at 1210–11.

"*Sealock* clearly establishes that when an inmate or pretrial detainee complains of and displays symptoms consistent with a potentially life-threatening condition, a prison official who refuses the inmate's or detainee's request for medical treatment *and takes no other action* violates the Constitution." *Rife*, 742 F. App'x at 388. That is not what happened here, however. Burke did not complain of or display symptoms of a life-threatening condition like the *Sealock* plaintiff. Burke moaned and told Norton he was in pain and needed to go to the hospital, but his complaints of pain were general. He did not say where he was in pain or describe any specific symptoms, much less a symptom like severe chest pain that would be consistent with a potentially life-threatening condition. Burke testified that his injuries made it hard to breathe without pain and that he had to take shallow breaths, but there is no evidence Burke informed Norton of this symptom, nor is there evidence Burke's shallow breathing was either obvious or consistent with a potentially life-threatening condition. The Court therefore concludes that *Sealock* does

not place "beyond debate" the conclusion that Norton was deliberately indifferent to Burke's serious medical needs. *Mullenix*, 577 U.S. at 14.

As *Sealock* is the only relevant authority Burke identifies, the Court finds that Burke has not met his burden to show clearly established law. Norton is therefore entitled to qualified immunity on Burke's claim for deliberate indifference to serious medical needs, and the Court declines to consider whether Norton's conduct could amount to a constitutional violation.

### 4.  Denial of Access to the Courts

The SAC alleges that neither Norton nor Samuel filed any kind of report or documentation regarding the underlying basis for Burke's arrest, the arrest itself, the decision to take Burke to Detox, the circumstances of Burke's fall and injuries, or his transport to Detox by an on-duty officer. SAC ¶ 6. Although the SAC does not expressly assert a claim against Samuel or Norton based on these omissions, *see generally id.* ¶¶ 9–10, Norton and Samuel briefly argue that to the extent Burke claims that their failure to prepare police reports is a constitutional violation, they are entitled to qualified immunity. *See* Norton's Mot. at 18–19; Samuel's Mot. at 15.

In response, Burke argues at length that Norton and Samuel violated Burke's constitutional right of access to the courts by engaging in a cover-up and "conspiracy of silence" to prevent Burke from identifying who pushed him and who was present at his arrest. *See* Resp. to Norton's Mot. [Doc. No. 89] at 18–27; Resp. to Samuel's Mot. [Doc. No. 91] at 16–25. He further argues that Norton and Samuel were assisted in this cover-

up by the OCPD's policy of not documenting public intoxication arrests that result in a

person being taken to Detox.

Samuel and Norton object to these arguments on several grounds. First, they

contend Burke should not be allowed to assert a court-access claim because that claim

was not alleged against them in the SAC and is untimely. Second, they argue they are

entitled to qualified immunity because the Tenth Circuit has not recognized a backward-

looking court-access claim based on a police cover-up and Burke has not identified any

case demonstrating that such a right was clearly established. Third, they argue that their

decision not to prepare a report of Burke's arrest was based on a reasonably perceived

statutory obligation. Finally, they argue that a court-access claim is ancillary to a

plaintiff's underlying claims and necessarily fails if there are no such underlying claims.

As discussed below, the Court finds this last argument dispositive. Specifically,

and assuming without deciding that Burke's court-access claim is properly raised,[18] the

---

[18] "An issue raised for the first time in a motion for summary judgment may
properly be considered a request to amend the complaint, pursuant to Federal Rule of
Civil Procedure 15," and a district court's refusal to address the new issue is construed as
a denial of plaintiffs' request. *Pater v. City of Casper*, 646 F.3d 1290, 1299 (10th Cir.
2011). Although a court should grant leave to amend "when justice so requires," Fed. R.
Civ. P. 15(a)(2), a "court properly denies leave where a late shift in the thrust of the case
will prejudice the other party in maintaining his defense upon the merits. The liberalized
pleading rules do not allow plaintiffs to wait until the last minute to ascertain and refine
the theories on which they intend to build their case. In addition, untimeliness alone is a
sufficient reason to deny leave to amend when the party filing the motion has no adequate
explanation for the delay." *Pater*, 646 F.3d at 1299 (cleaned up).

Burke was aware of the facts underlying his court-access claim since at least May
20, 2019, when he filed his SAC asserting that very claim against the City. *See* SAC ¶ 12.
Yet the SAC conspicuously does not allege any such claim against Norton and Samuel.

Court concludes that Burke cannot maintain a court-access claim because he has not

identified a potentially meritorious underlying claim and therefore has not suffered an

injury by being shut out of court. Alternatively, the Court concludes that Norton and

Samuel are entitled to qualified immunity because it was not clearly established that their

conduct violated Burke's constitutional right to court access.

### a.   Burke has not identified a potentially meritorious underlying claim.

"While the precise source of the constitutional right to court access remains

ambiguous, the existence of such right, generally speaking, is quite clear."[19] *Lynch v.*

*Barrett*, 703 F.3d 1153, 1161 (10th Cir. 2013). In *Christopher v. Harbury*, the Supreme

Court divided court-access claims into two types. The first involves "claims that systemic

official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the

present time." 536 U.S. at 413. For example, a prisoner might claim that he is being

---

Nor does it allege facts suggesting Norton and Samuel were engaged in any cover-up or
conspiracy of silence.

Burke's summary judgment briefing is replete with accusations that Norton,
Samuel, and Jennings engaged in a concerted cover-up to shield the identity of the other
officer present when Burke was arrested and fell. But these accusations are conclusory.
The only facts Burke points to as suggestive of a cover-up are that the officers could not
recall various details of that evening at their depositions more than two years after
Burke's arrest. These facts may show a failure of memory, but they fall short of
suggesting a conspiracy of silence. Indeed, Burke equally could not recall key details of
that evening at his own deposition.

[19] The Supreme Court has grounded the right to court access in the Article IV
Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth
Amendment Due Process Clause, and the Fourteenth Amendment Due Process and Equal
Protection Clauses. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002)
(collecting cases).

prevented from litigating a meritorious civil rights claim because he lacks access to a law library or cannot pay a filing fee. *Id.* Such claims are considered forward-looking because the purpose is to place the plaintiff in a position to pursue an underlying claim for relief after the frustrating condition has been removed. *Id.*

The second type of claim is backward-looking. These claims involve allegations that official action has prevented the plaintiff from ever trying a case (or trying it with all material evidence). *Id.* at 413–14. For example, a claim is backward-looking if it alleges that official obstruction caused a plaintiff to lose a meritorious case or deprived him of an opportunity to pursue a claim because the obstruction extended throughout the plaintiff's time to sue under the statute of limitations. *Id.* at 414 (citing cases from three different courts of appeals). The object of this type of claim is not a judgment in a later lawsuit but a judgment on the access claim itself. *Id.*

Although the Supreme Court did not endorse the validity of backward-looking court-access claims, *see Lynch*, 703 F.3d at 1161, it observed that the ultimate justification of both types of claims is "to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Harbury*, 536 U.S. at 414–15. To that end, the Court noted that the right to court access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id.* at 415. A plaintiff must therefore identify a "nonfrivolous," "arguable" underlying claim as an element of a court-access claim. *Id.* at 415–16.

Here, Burke contends that Norton's and Samuel's failure to make a report of their interaction with him and their alleged participation in a "conspiracy of silence" prevented

him from identifying and suing all of the officers who were present when he was arrested and injured. *See* Resp. to Norton's Mot. [Doc. No. 89] at 21–22. Burke fails to identify the claims he has been prevented from asserting against those unknown officers. However, the Court infers that they are the same claims he asserted against Norton and Samuel in this case: unlawful arrest, excessive force, deliberate indifference to serious medical needs, and negligence.

But the Court has found herein that Burke cannot prevail on his constitutional claims—and not because of insufficient evidence or other bars created by Norton's and Samuel's alleged cover-up. As explained above, the evidence shows Norton and Samuel had probable cause to arrest Burke for public intoxication. Additionally, Burke's excessive force and deliberate indifference claims fail because Burke has not met his burden to show the officers' conduct violated clearly established law.[20] Finally, though he has done it improperly, as discussed below, Burke has sought to voluntarily dismiss his state-law negligence claim against Norton and Samuel in response to those officers' arguments. This indicates Burke does not view the claim as having merit; regardless, he has not briefed any arguments on the claim, and it is his burden to identify a meritorious underlying claim.

In short, Burke has not identified a potentially meritorious underlying claim that has been lost as a result of Norton's and Samuel's alleged interference. In the absence of

---

[20] The Court found insufficient evidence to support an excessive force claim against Norton, but the Court's alternative finding regarding qualified immunity forecloses Burke's claim independent of any evidentiary failures.

such a claim, his ancillary claim for denial of access to the courts necessarily fails. *Cf.*

*Harbury*, 536 U.S. at 418 (finding that plaintiff's complaint failed to state a claim for

denial of court access where it did not identify an underlying cause of action that was

compromised by government's alleged deception). So, assuming the claim is properly

raised, Norton and Samuel are entitled to summary judgment on Burke's court-access

claim.

### b.  Norton and Samuel are entitled to qualified immunity.

Alternatively, Norton and Samuel are entitled to qualified immunity because

Burke has not shown that Norton's and Samuel's conduct violated clearly established

law. To overcome Norton's and Samuel's claim of qualified immunity based on an

alleged conspiracy of silence, "[Burke] must show the scope of his right to court access

was sufficiently clear such that a reasonable officer would have understood Defendant

Officers' refusal to name those responsible for [arresting and] exercising excessive force

against [Burke] was not merely ill-advised, but violated that right." *Lynch*, 703 F.3d at

1161. "[S]imply to say the Constitution recognizes a right to court access casts too high a

level of generality over [the court's] inquiry. To show *his* alleged right to court access

was clearly established in the proper sense, Plaintiff should identify cases of controlling

authority at the time of the incident or a consensus of cases of persuasive authority

clearly establishing the scope of the right encompasses the facts presented, such that a

reasonable officer could not have believed that his actions were consistent with that

right." *Id.* (cleaned up) (brackets added).

Here, Burke identifies three relevant cases: *Lynch v. Barrett*, 703 F.3d 1153 (10th

Cir. 2013), *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208 (10th Cir. 2004), and

*Walker v. Hickenlooper*, 627 F. App'x 710 (10th Cir. 2015) (unpublished).

In *Lynch*, the plaintiff alleged that a group of police officers violated his right to

court access by refusing to disclose which of the officers had used excessive force against

him in the course of an arrest. 703 F.3d at 1155. Like here, the plaintiff also alleged that

the officers' "conspiracy of silence" was precipitated by a municipal policy or practice.

*Id.* The district court denied the officers qualified immunity, finding that the plaintiff had

presented facts sufficient to warrant a finding that the officers violated his constitutional

right to court access and that his right to court access was clearly established at the time

of the violation. *Id.* at 1158.

On appeal, however, the Tenth Circuit reversed, holding that the officers were

entitled to qualified immunity because the law was not clearly established. *Id.* at 1162–

63. The court observed:

> In 2002, the Supreme Court in *Harbury* "was careful not to endorse the
> validity of . . . backwards looking [right to access] claims." Henceforth, the
> Supreme Court has never defined the right of court access to include a
> backwards looking claim based on a "conspiracy of silence" aimed at
> interfering with an individual's ability to procure evidence of official
> misconduct. Nor have we ever endorsed such constitutional claim.

*Id.* at 1161–62 (cleaned up). Surveying its prior precedents, the court noted that in *Wilson*

*v. Meeks*, 52 F.3d 1547 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*,

533 U.S. 194 (2001), "[it had] squarely rejected a right to access claim based on, among

other things, allegations that a police official 'ordered a "code of silence" concerning the

Wilson shooting[,]'" *Lynch*, 703 F.3d at 1162 (quoting *Wilson*, 52 F.3d at 1557), and in

*Jennings* (on which Burke relies) it had begun its analysis by observing that "[t]his

Circuit has not recognized a constitutional cause of action based on denial of access to

courts under these circumstances." *Id.* (quoting *Jennings*, 383 F.3d at 1207). Finding

these cases dispositive, the court held:

> At least in the Tenth Circuit, the question of whether an evidentiary cover-
> up by police officials may violate an individual's constitutional right to
> court access was not clearly established at the time of the alleged violation.

*Id.*

The alleged conduct in *Lynch* occurred in 2008, and so the court's analysis was

focused on that time period. But neither *Lynch* nor *Walker* (the only case Burke cites that

postdates *Lynch*) supports a conclusion that the law was any more clearly established in

2017, when the events in this case occurred. In particular, *Lynch* does not help Burke

avoid qualified immunity because the court in that case "simply *assume[d]*," without

deciding, that "a police cover-up designed to hinder pursuit of a legal claim may violate

an individual's constitutional right to court access." *Id.* at 1160.

*Walker*, an unpublished decision from 2015, likewise does not establish that an

evidentiary cover-up violates a constitutional right to court access. That case merely held

that the district court had properly dismissed a court-access claim because the plaintiff

was eventually able to sue and had not alleged any facts suggesting he was less likely to

prevail as a result of alleged concealment that had delayed his suit. *Walker*, 627 F. App'x

at 719 (citing *Jennings*, 383 F.3d at 1209). Like *Lynch*, the *Walker* court merely assumed

that such a claim was actionable and rejected it on different grounds.[21] For these reasons, and because Burke does not point to any other relevant caselaw—whether in the Tenth Circuit or elsewhere—Norton and Samuel are entitled to qualified immunity. *Cf. Lewis v. City of Edmond*, 48 F.4th 1193, 1202 (10th Cir. 2022) (concluding that the plaintiffs failed in their burden of showing the law was clearly established by failing to identify a precedent finding a constitutional violation under the circumstances presented and denial of qualified immunity was therefore improper).

### B.  Constitutional Claims Against the City

Deprivations of federal constitutional rights by persons acting under color of state law are actionable under 42 U.S.C. § 1983. Municipalities and other local government units are considered "persons" within the meaning of § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). But municipalities are liable under § 1983 only for their own unlawful acts. *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017). "Accordingly, to prove a § 1983 claim against a municipality, a plaintiff must show the existence of a municipal policy or custom which directly caused the alleged injury." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

---

[21] Because the Court concludes that *Walker* does not support Burke's position, it need not consider whether an unpublished circuit decision can clearly establish the law. *See Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) (noting that while the Tenth Circuit has indicated that an unpublished opinion "provides little support for the notion that the law is clearly established" on a given point, it has "never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established"). *But see Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("[E]xisting precedent must have placed the . . . constitutional question beyond debate.").

"The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). The following practices may be deemed an official policy or custom for § 1983 municipal-liability purposes: "[1] a formal regulation or policy statement, [2] an informal custom that amounts to a widespread practice, [3] decisions of municipal employees with final policymaking authority, [4] ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and [5] the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239–40 (10th Cir. 2020) (quoting *Pyle*, 874 F.3d at 1266).

To establish causation, a § 1983 plaintiff must show that the municipality was the "moving force" behind the injury alleged. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). This requires a plaintiff to demonstrate "a direct causal link between the municipal action and the deprivation of federal rights." *Id.* A plaintiff can satisfy this burden by showing that a municipal policy is facially unconstitutional. *Hinkle*, 962 F.3d at 1240. "When a policy is facially constitutional," however, "the burden of establishing causation (and culpability) is heavy." *Id.* at 1241 (citing *Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." (citations omitted))).

The City argues that it is entitled to summary judgment in this case because there is no evidence of a municipal policy or custom that directly caused a violation of Burke's constitutional rights under the Fourth or Fourteenth Amendments. Where the movant does not bear the burden of persuasion at trial, "[the movant] may satisfy this burden 'by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim.'" *Teets*, 921 F.3d at 1211. Because a municipal policy and causation are both essential elements of a § 1983 claim, the City has met its initial burden to show it is entitled to summary judgment on Burke's § 1983 claims. The burden thus shifts to Burke to set forth specific facts from which a rational trier of fact could find for him. *Herrera*, 506 F.3d at 1309.

In his Response, Burke points to the following facts: (1) the City has a policy (OCPD Policy 265.10) encouraging the use of Detox for publicly intoxicated individuals; (2) it is the City's policy to make an arrest report for public intoxication only if the person is taken to jail, rather than Detox; (3) neither Norton, Samuel, nor Jennings wrote any kind of report about Burke's arrest or injury; (4) Norton, Samuel, and Jennings repeatedly testified that they could not remember the details of Burke's arrest or injury and could not recall the identities of the other officers present; (5) the City has a policy (OCPD Policy 290.20) requiring an off-duty officer to notify an on-duty supervisor and make a detailed written report when the off-duty officer "uses his peace officer authority or becomes involved in a situation, which may reflect negatively on or cause involvement of the [OCPD]"; and (6) numerous other City policies required a written report, including the City's use of force policies.

Burke argues that the City's informal policy of not documenting arrests that end in Detox led to a violation of Burke's constitutional right to court access. He contends that Norton, Samuel, and Jennings caused a cover-up to shield the identity of the other officer who participated in arresting, handcuffing, and ultimately either "attacking" Burke or, alternatively, failing to protect him. He contends that these officers were assisted in this alleged cover-up by the City's policy regarding public intoxication arrests. *See* Resp. to City's Mot. [Doc. No. 90] at 20. Burke's view of the City's policy is that no report is ever required as long as the end of the detainment is Detox. *Id.*

But as the City points out—and Burke himself argues at length—the City's policies did require a written report of Burke's fall and injuries, regardless of whether an "arrest" report was allowed. In particular, the City requires officers to make written reports of every use of force and/or action that results in either no injury or injury requiring less than in-patient treatment, as in this case. And this policy expressly applies even when an arrest report is not "applicable": in that case, the policy directs involved and witnessing employees to complete a supplemental report. *See* OCPD Procedure 150.10. The City also prohibits its officers from testifying, making reports, or conducting business in a less than truthful and cooperative manner. *See* OCPD Rule 120.0 [Doc. No. 77-47]. The officers in this case might have violated those policies. But a municipality is not liable unless its policy caused a constitutional violation; subjecting a municipality to liability because an officer *deviates* from policy would turn the causation analysis on its head.

Thus, even assuming Norton and Samuel violated Burke's constitutional right to court access by engaging in a cover-up, there are no facts from which a reasonable jury could find that the City's policies—which expressly required documentation of uses of force and prohibited such cover-ups—were the moving force behind that violation. The City is thus entitled to summary judgment on Burke's claim that the City denied him meaningful access to the courts.

Burke does not expressly argue that any City policy caused the other constitutional violations alleged in this case, and the Court finds that the City is also entitled to summary judgment on those claims. With respect to Burke's unlawful arrest claim, the Court has found that Norton and Samuel had probable cause to arrest Burke; thus, there is no constitutional violation that supports this claim. As for Burke's claims of excessive force and deliberate indifference to medical needs, the Court finds that these claims fail because Burke has not pointed to any municipal policy that caused those alleged violations.

### C.  Burke's State-Law Claims

Finally, Burke alleges that Samuel, Norton, and the City were negligent under state law. Samuel and Norton moved for summary judgment on this claim on the ground that they were acting within the scope of their employment and therefore are not proper defendants to a negligence claim under the GTCA. Samuel separately argued that there is insufficient evidence to support a negligence claim against him because the undisputed facts show he was not present when Burke was injured. Burke failed to address any of Norton's and Samuel's substantive arguments. Instead, in a single sentence at the end of

his response briefs, he purports to dismiss his negligence claims against Norton and Samuel without prejudice. *See* Resp. to Samuel's Mot. at 27; Resp. to Norton's Mot. at 36.

Norton and Samuel object to this attempted dismissal. They argue that under Federal Rule of Civil Procedure 41(a), Burke cannot dismiss his claims at this stage of the litigation without a stipulation or court order. They contend that the merits of Burke's negligence claim have been fully briefed and they are entitled to summary judgment on that claim. *See* Reply [Doc. No. 97] at 24–25. Burke did not request a surreply on this issue.

The Court agrees that Burke may not unilaterally dismiss his negligence claim at this stage of the litigation. Norton and Samuel suggest that Rule 41(a) is the pertinent rule, and they correctly point out that Rule 41(a) does not allow unilateral dismissals after the filing of an answer or summary judgment motion. However, Rule 41(a) "speaks to dismissal of an *action*, not just a claim within an action." *Gobbo Farms & Orchards v. Poole Chem. Co.*, 81 F.3d 122, 123 (10th Cir. 1996) (emphasis added) (observing that plaintiff could not voluntarily dismiss one of its claims under Rule 41(a)). Where a plaintiff seeks to dismiss less than all claims asserted in an action, the appropriate procedural mechanism appears to be amendment under Rule 15(a), not dismissal under Rule 41(a). *See* 3 James Wm. Moore et al., Moore's Federal Practice - Civil § 15.16 (2021) ("When a party seeks to voluntarily dismiss some, rather than all, of the claims in a multi-count complaint, Rule 41(a) does not apply. Rather, a court should consider the motion to be a request for leave to amend under Rule 15."); *Gobbo Farms*,

81 F.3d at 123. *But see GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 888 (10th Cir. 2005) (affirming district court's dismissal of some of plaintiff's claims with prejudice under Rule 41(a)(2)).

The distinction is largely immaterial in this case, however, because the time under Rule 15(a)(1) for amendments as a matter of right has long since passed. Burke thus cannot unilaterally dismiss his negligence claim through a Rule 15(a) amendment any more than he can through a voluntary dismissal under Rule 41(a). Under either rule, Burke would need the Court's leave. Fed. R. Civ. P. 15(a)(2), 41(a)(2). Burke has not sought or obtained such leave—even despite being on notice of Samuel's and Norton's position—and therefore his notice of dismissal is ineffective.[22]

The question remains whether the Court should consider the merits of Defendants' arguments, which is what the Defendants would have this Court do, having already resolved all of the federal claims that formed the basis of this Court's original jurisdiction over this lawsuit. "When a federal district court has original jurisdiction over a civil cause of action, [28 U.S.C.] § 1367 determines whether it may exercise supplemental

---

[22] Even were the Court to construe Burke's notice of dismissal as a request for leave, the Court would decline to consider that request because it fails to provide any grounds for the requested relief. *See* Fed. R. Civ. P. 7 (requiring that requests for a court order be made by motion and state with particularity the grounds for seeking the order); *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 771 F.3d 697, 706 (10th Cir. 2014) (court need not grant bare request to amend); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999) ("[Plaintiff]'s single sentence, lacking a statement for the grounds for amendment and dangling at the end of her memorandum, did not rise to the level of a motion for leave to amend. Because a motion for leave to amend was never properly before it, the district court did not abuse its discretion in failing to address [Plaintiff]'s request for leave to cure deficiencies in her pleadings.").

jurisdiction over other claims that do not independently come within its jurisdiction, but

that form part of the same Article III 'case or controversy.'" *Jinks v. Richland Cnty.*, 538

U.S. 456, 458 (2003). Section 1367(a) provides as follows:

> Except as provided in subsections (b) and (c) or as expressly provided
> otherwise by Federal statute, in any civil action of which the district courts
> have original jurisdiction, the district courts shall have supplemental
> jurisdiction over all other claims that are so related to claims in the action
> within such original jurisdiction that they form part of the same case or
> controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

But simply because a district court may exercise supplemental jurisdiction does

not mean that it should. Indeed, § 1367(c) "describe[s] situations in which a federal court

may or must decline to exercise supplemental jurisdiction." *Jinks*, 538 U.S. at 459.

Specifically, § 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim
> under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the
> district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original
> jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining
> jurisdiction.

28 U.S.C. § 1367(c). Section 1367 promotes federalism and comity considerations. *Cf.*

*McWilliams v. Jefferson Cnty.*, 463 F.3d 1113, 1117 (10th Cir. 2006) (explaining that

where all federal-law claims are eliminated before trial, "[n]otions of comity and

federalism demand that a state court try its own lawsuits . . . ." (citation omitted)).

Having carefully considered this statute, the Court declines to exercise supplemental jurisdiction over Burke's state-law negligence claims under § 1367(c). Because the Court has granted summary judgment in favor of Defendants on all of the claims over which this Court has original jurisdiction, it may decline supplemental jurisdiction over Burke's remaining state-law claims. The Tenth Circuit favors this approach. *See, e.g.*, *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020) (explaining that "[t]he Supreme Court has encouraged the practice of dismissing state claims or remanding them to state court when the federal claims to which they are supplemental have dropped out before trial"); *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (holding district court did not abuse its discretion by declining to exercise supplemental jurisdiction over state-law claims after the district court granted summary judgment for defendants on all federal claims); *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (explaining that once a "federal claim has dropped out of the picture" the most common response is to allow the state court rather than the federal court to resolve state-law claims under "[n]otions of comity and federalism" (citation omitted)).

Further, because the Defendants' arguments turn on application of the GTCA, a state statute controlling the scope and extent of the State's waiver of sovereign immunity, the Court finds that remand is appropriate here. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). The Court is reluctant to engage in

Case 5:18-cv-00984-JD   Document 124   Filed 06/26/24   Page 57 of 59

unnecessary determinations of state law when it otherwise has no original jurisdiction, especially when such determinations involve the scope of the state's waiver of governmental immunity. *See* 28 U.S.C. § 1367(c)(1), (c)(3). The state courts are better positioned to determine how the GTCA applies to the conduct alleged in this case or whether it applies at all.[23] And Congress has indicated that declination of supplemental jurisdiction is proper in these circumstances. *See* 28 U.S.C. § 1367(c)(1), (c)(3).

Because this case was removed from state court, a proper disposition of Burke's remaining state-law claims may include remand to state court rather than dismissal. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) ("[A] district court has discretion to remand to state court a removed case involving pendent claims upon a proper determination that retaining jurisdiction over the case would be inappropriate."). Under the circumstances of this case, the Court finds that an order of remand, rather than dismissal, "best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Id.*

---

[23] The contours of Burke's negligence claim against Samuel and Norton are not clear based on the record before this Court. And like the state-law claim at issue in *McWilliams*, 463 F.3d at 1118, the pleading and briefing do not elucidate the contours of the negligence claim. *See* SAC [Doc. No. 27] ¶ 11 (alleging "[t]he acts of the Defendants [Samuel and Norton] were performed . . . in the alternative, negligently"); Plf.'s Resps. to Samuel's Mot. [Doc. No. 91] at 27 & Norton's Mot. [Doc. No. 89] at 36 (attempting to dismiss claim without prejudice). Samuel and Norton do not argue, at least to this Court, that the negligence claim has been abandoned/waived or forfeited by Burke. Rather, as noted above, they expressly object to Burke's attempt to dismiss the claim without prejudice, *see* Reply [Doc. No. 97] at 24–25. Therefore, the Court exercises its discretion to remand this claim along with the negligence claim against the City. *See Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction . . . is purely discretionary.").

Accordingly, Burke's state-law negligence claims against Norton, Samuel, and the City will be remanded to the state court from which they were removed, which is the District Court of Oklahoma County, State of Oklahoma.

## VI.   CONCLUSION

For the reasons stated above, the Court finds that Defendants are entitled to summary judgment on Burke's claims for federal constitutional violations brought under 42 U.S.C. § 1983 and that Burke's remaining state-law tort claims against the Defendants should be remanded to state court.

IT IS THEREFORE ORDERED that Defendants' motions are GRANTED IN PART AS FOLLOWS:

(1)   Norton's Motion for Summary Judgment [Doc. No. 79] is GRANTED to the extent it seeks summary judgment on Plaintiff's federal constitutional claims brought under 42 U.S.C. § 1983.

(2)   Samuel's Motion for Summary Judgment [Doc. No. 80] is GRANTED to the extent it seeks summary judgment on Plaintiff's federal constitutional claims brought under 42 U.S.C. § 1983.

(3)   The City's Motion for Summary Judgment [Doc. No. 77] is GRANTED to the extent it seeks summary judgment on Plaintiff's federal constitutional claims brought under 42 U.S.C. § 1983.

(4)   Burke's remaining state-law claims are REMANDED to the District Court of Oklahoma County, State of Oklahoma.

IT IS SO ORDERED this 26th day of June 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE